## UNITED STATES BANKRUPTCY COURT
## FOR THE
## DISTRICT OF MASSACHUSETTS

~~~~~~~~~~~~~~~~~~~~~~~~~~~~

In re
**SUSAN C. MORENCY,**                      Chapter 7
     Debtor                               Case No. 10-13666-JNF

~~~~~~~~~~~~~~~~~~~~~~~~~~~~

### MEMORANDUM

## I. INTRODUCTION AND PROCEDURAL BACKGROUND

The contested matter before the Court is the Objection by the Creditor, Conn Kavanaugh Rosenthal Peisch & Ford LLP (the "Creditor" or "Conn Kavanaugh"), to the proof of claim filed by Carl Follo, Follo Hospitality, Inc. and Carpa Real Estate, LLC (collectively, "Follo"), through which Follo asserts Susan C. Morency ("Morency" or the "Debtor") owes him the sum of $501,174 based on a Vermont state court judgment. The Creditor objects to Follo's proof of claim, asserting that the Vermont judgment was not final, has no preclusive effect in this case, and was obtained with falsified evidence. Follo responds, arguing that the Vermont judgment was final and has preclusive effect.[1] This Court shall refer to this contested matter as the "claim objection."

----

[1] In addition to the Response to Conn Kavanaugh's Objection, Follo filed a Cross-Motion for Equitable Subordination of Claim. Judge Frank J. Bailey denied the Cross-Motion on May 16, 2013. At a status conference conducted by this Court on June 15, 2015, Follo formally withdrew the Cross-Motion.

The Debtor and the Follo also are parties to an adversary proceeding in which Follo has sought to except the debt owed to him by Morency from discharge.[2]  In this decision, the Court shall refer to that dispute as the "adversary proceeding."  Although the claim objection and the adversary proceeding arise in the same case and in some respects present similar issues, they have not been consolidated for hearings or for determination on the merits.

Judge Frank J. Bailey initially heard the claim objection on March 8, 2013, and, approximately two months later, on May 16, 2013, in a "Proceeding Memorandum/Order," indicated his intention to schedule an evidentiary hearing on the claim objection (the "May 16th Order").  In the May 16th Order, Judge Bailey summarized the positions of the parties, and, as noted above, denied the Cross-Motion for Equitable Subordination.  In addition, he ruled as follows:

> Creditor CKRPF objects to Follo's claim in the amount of $501,174 plus attorney's fees, costs and post judgment interest accruing subsequent to May 4, 2007. CKRPF objects to the claim (i) because it purports to be based on a judgment, but the judgment was vacated on appeal and has not yet been re-entered and therefore is not final or preclusive and (ii) because the judgment was obtained with falsified evidence.  Follo defends his claim, arguing that the judgment is final, preclusive and protected from review here by the Rooker-Feldman doctrine.  In addition, Follo moves under 11 U.S.C. § 510(c)

_____

[2] On May 14, 2010, Follo commenced an adversary proceeding against Morency. On April 2, 2013, Judge Frank J. Bailey issued a Memorandum and Judgment pursuant to which he entered judgment in favor of Morency. *See* Follo v. Morency (In re Morency), No. 13-1133, 2013 WL 1342485 (Bankr. D. Mass. April 2, 2103), *aff'd in part and remanded*, 507 B.R. 421 (D. Mass. 2014).  On May 22, 2015, approximately 14 months after the decision of the United States District Court for the District of Massachusetts, Judge Bailey recused himself from determining the issues on remand in the adversary proceeding; those issues are currently before this Court for determination.

2

to equitably subordinate the proof of claim filed by CKRPF, for $4,7287.51, on the basis that CKRPF's objection to Follo's claim is meritless. (Only three claims have been filed in this case, all nonpriority and unsecured; the third, to which no challenge has been filed, is for $5,727.69.)

In an adversary proceeding to determine the dischargeability of Follo's claim, this court has had occasion to determine the preclusive effect of the Vermont judgment on which Follo relies. There the court determined that, because the judgment was vacated on appeal (albeit only to consider a possible increase in the amount of the judgment) and has not entered anew [sic], for most purposes, including merger, it does not have preclusive effect. Therefore, the judgment has no claim-preclusive effect here and is not an independent right of recovery from Follo's underlying tort claim. At the same time, the Court determined that the judgment is final for purposes of issue preclusion (or collateral estoppel), but also that, under Vermont law (which governs the preclusive effect of the judgment), issue preclusion will apply only if, among other things, (i) there was a full and fair opportunity to litigate the issue in the earlier action and (ii) applying preclusion in the later action is fair. The burden of proof as to these two issues is on the party opposing preclusion (but the burden of proof as to preclusion in general is on the party urging preclusion. I understand CKRPF to be contending that, where the judgment was obtained with falsified evidence, applying issue preclusion in this proceeding, especially against CKRPF, as a stranger to the earlier proceeding, is not fair and does not afford CKRPF a full and fair opportunity to litigate the validity of Follo's claim. . . .

Follo also suggests, in a reply brief, that CKRPF, as a creditor, lacks standing to object to Follo's claim. This argument is without basis. A creditor whose recovery would be diluted by the claim of another creditor is a party in interest and, as such, has standing to object to the other creditor's claim. 11 U.S.C. § 502(a) (a party in interest may object to a claim).

The Rooker-Feldman doctrine is of no help to Follo. It applies only to a final judgment, which is lacking here. Absent finality, there is no judgment.[3]

---

[3] Judge Bailey also observed in the May 16th Order that "while the doctrines of res judicata and collateral estoppel prevent the relitigation of claims and issues, the applicability of those doctrines to particular claims and issues must itself be established; their applicability is not self-evident or self-executing. Follo has not begun to make the case for their application here, especially to a party who was a stranger to the earlier proceeding."

3

Follo filed a Notice of Appeal from the May 16th Order, as well as an Election to the District Court.  The Creditor moved to dismiss the appeal, and the United States District Court for the District of Massachusetts dismissed the appeal as interlocutory on September 19, 2013.  Prior to the dismissal of the interlocutory appeal, the Creditor sought discovery from Follo in the claim objection matter pursuant to Fed. R. Bankr. P. 2004.  On September 12, 2013, the bankruptcy court granted the Creditor's Motion to Conduct Rule 2004 Examination of Creditor Carl Follo over Follo's objection.

On November 20, 2013, Judge Bailey conducted an evidentiary hearing on the claim objection at which four witnesses testified, namely Stephen S. Ankuda ("Attorney Ankuda"), Carl Follo, Paul D. Florindo ("Florindo"), and Morency, and 11 exhibits were introduced into evidence.  Consistent with the bankruptcy court's bench order, the parties filed a "Joint Submission and Stipulation of Additional Evidence in Connection with the November 20, 2013 Evidentiary Hearing on Conn Kavanaugh's Objection to Claim" pursuant to which they submitted three additional exhibits, namely Carl Follo's testimony in Adv. P. No. 10-1133, and two portions of his testimony during litigation in the Windham County Superior Court, which litigation resulted in entry of judgment in favor of Follo and an appeal to the Vermont Supreme Court.  See Follo v. Florindo, 185 Vt. 390, 970 A.2d 1230 (2009).

Following the trial, on December 18, 2013, the parties submitted proposed findings of fact and rulings of law.  In addition, the Creditor submitted a brief.  Approximately seventeen months later, on May 22, 2015, Judge Bailey recused himself from the claim

4

objection and the adversary proceeding.

On June 18, 2015, this Court conducted a status conference as to the claim objection. At the status conference, Follo withdrew his Motion for Equitable Subordination, which, in any event, had been denied by Judge Bailey. Upon inquiry from the Court as to the effect of Judge Bailey's recusal on the matter under advisement and how the parties wished to proceed, counsel for both Follo and the Creditor consented in open court to this Court's determination of the claim objection without further evidence or proceedings based upon the existing record.

The Court now makes its findings of fact and conclusions of law in accordance with Fed. R. Bankr. P. 7052. Moreover, this Court certifies that it is familiar with the entire record of proceedings and that the claim objection may be completed on the record without prejudice to the parties. *See* Fed. R. Bankr. P. 9028. The issue presented is whether the Creditor has sustained its burden of proof that Follo does not have an allowed claim in this bankruptcy case because of alteration of an exhibit in the Vermont litigation. For the reasons set forth below, this Court shall enter an order overruling the Creditor's Objection.

**II. FACTS**

A. <u>Stipulated Facts</u>

On November 7, 2013, Conn Kavanaugh and Follo filed a Joint Pre-Trial Memorandum in which they set forth the following admitted facts which required no proof:

1. Follo's claim (the "Claim") against . . . Morency . . . arises from a 2003

5

transaction, whereby Follo purchased an inn and an adjoining cottage located in Rockingham, Vermont (the "Inn") from Morency and Paul Florindo for $1,245,000.00. *Follo v. Florindo et al.*, 970 A.2d 1230, 2009 VT 11 (Supreme CT. of Vt. 2009) (the "Vermont Supreme Court Decision"); FolIo's Trial Exhibit 15, *Bill of Sale*.

2. Follo claims that his decision to purchase the Inn for the Purchase Price was based on his belief that the Inn generated certain levels of revenue and maintained certain occupancy rates. Vermont Supreme Court Decision at 1241, Carl Follo Trial Testimony, Jury Trial Day 1 at 97-100, 216.

3. Specifically, Follo employed a "gross revenue multiplier" approach to calculating appropriate sales prices for inns [sic]. *Vermont Supreme Court Decision* at 1241, Carl Follo Trial Testimony, Jury Trial Day 1 at 97-100, 216.

4. The sale of the Inn to Follo closed in March, 2003.

5. In 2004, Follo filed a complaint against Florindo, Morency, Cranberry Farm LLC, PSFM, Inc., and the real estate agents involved in the sale of the Inn in the Windham Superior Court [Docket No. 110·2·04 Wmcv], seeking, inter alia, damages based upon common law fraud and consumer fraud. *Vermont Supreme Court Decision* at 1235.

6. At the close of Follo's case, the Superior Court granted Morency and Florindo's motion to exclude punitive damages as a matter of law. The jury in the Windham County Superior Court awarded a judgment in favor of Follo and against Florindo and Morency for common-law fraud and violations of the Vermont Consumer Fraud Act in the amount of $645,000. The Superior Court concluded in deciding post-verdict motions that the jury award was too high. Follo accepted remittur of the damages to $295,000. The Superior Court entered final judgment against Morency and Florindo in the amount of $295,000 plus prejudgment interest, costs and attorneys' fees for a total judgment of $501,174.00 with post-judgment interest to accrue subsequent to May 4, 2007 (the "Vermont Judgment").

7. Morency and Florindo appealed the Vermont Superior Court judgment to the Vermont Supreme Court and Follo cross appealed. The Vermont Supreme Court upheld the findings of the Superior Court on all issues raised on appeal by Morency and Florindo but remanded the case to the Superior Court on the issue of punitive damages.

8. On April 5, 2010 (the "Petition Date"), Morency filed a voluntary petition for relief under Chapter 7 of the United States Bankruptcy Code, 11 U.S.C. § 101 et seq. (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Massachusetts (the "Court"). Pursuant to Section 362 of the Bankruptcy Code, the Vermont action was stayed on the Petition Date.

9. On August 19, 2010, Follo filed his proof of claim relying on the Vermont Judgment. Follo subsequently filed a motion for relief from stay which was denied by this Court.

10. On August 19, 2010[,] Conn Kavanaugh filed its proof of claim.

11. On May 14, 2010, Follo filed a complaint objecting to the discharge of debt which resulted in the Adversary Proceeding Case 10-01133.

12. On September 1, 2012, a full evidentiary hearing was held and on April 2, 2013 this Court decided in Morency's favor on the dischargeability issue, which decision is currently under appeal to the Federal District Court.

13. On February 16, 2012, Conn Kavanaugh filed an Objection to Follo's Claim alleging that the Vermont Judgment had been obtained through fraud on the court, specifically that Follo had submitted altered or forged documents which were introduced into evidence by Follo and used to give the jury the impression that Morency had included numerous names in the guest information forms which were not corroborated in the room-assignment book.

14. On May 1, 2012, the Court held a non-evidentiary hearing on Conn Kavanaugh's Objection to determine whether to hold a full evidentiary hearing on Conn Kavanaugh allegations.

15. On May 16, 2013, the Court ruled that it would hold a full evidentiary hearing on Conn Kavanaugh's Objection on November 20, 2013.

B. Facts Adduced at Trial

Central to the Creditor's claim objection is the reliability and authenticity of an exhibit introduced into evidence at the trial of the Windham Superior Court. Conn Kavanaugh claims an exhibit was falsified and altered; Follo now agrees that the exhibit,

in fact, was altered.

At the trial in the bankruptcy court, Morency testified extensively about Exhibits 1 and 2, which were Exhibits 51 and 52 submitted by Follo during trial in the Windham Superior Court.  Morency identified them as "Guest Forms" and "Room Sheets," although the exhibits themselves are captioned "Guest Reservation Information" and "Reservations for the Inn," respectively.  Morency explained that  the Guest Forms were used to get the name, the address, the telephone number, and reservation dates for guests who planned to stay at the Inn, as well as credit card information.  She further explained that the Room Sheets showed her the number of rooms that were available at the Inn, the names of the guests in the rooms, and how many nights guests were staying, as well as how many guests were in each room.  The Room Sheets were kept in a three-ring binder on the front desk of the Inn for the year in which reservations were requested.  Each Room Sheet was set up to record information for two week days (Monday/Tuesday, Wednesday/Thursday, Friday/Saturday); there were separate Room Sheets for Sundays; the year was not reflected on the Room Sheets.  In addition, Morency recorded information on the Room Sheets in pencil.

During the Vermont trial, Morency was presented with Exhibits 1 and 2 (Vermont Trial Exhibits 51 and 52) together with a perpetual calendar.  Morency testified that she was unable to read the perpetual calendar because of the small font size appearing on it. She stated: "I couldn't see it. I couldn't -- it was so small. The print was so small I couldn't read the print." During the Vermont trial, Morency was asked to reconcile 2002 Guest Forms

8

and Room Sheets, which ostensibly were for the year 2002. She was unable to do so and her credibility as a witness was eroded.

Morency testified that, in preparing for trial in the adversary proceeding, she learned that Follo, pursuant to the parties' Joint Pretrial Memorandum, was intending to submit Exhibits 51 and 52 into evidence. Concerned about her prior trial testimony in the Vermont state court, she scrutinized the two exhibits that had been in Follo's custody since he had received them from Florindo, or obtained them from storage at the Inn prior to the commencement of the Vermont litigation. Morency testified that she learned that the Room Sheets that were admitted into evidence as Vermont Trial Exhibit 52 were not from 2002 but were, in fact, from 2001 and had been altered. She testified that she discovered copies of the 2001 Room Sheets in a box in a storage facility she used after the sale of her family home and explained that Florindo had stored the Room Sheets at her mother's house prior to its sale. The 2001 Room Sheets were admitted into evidence in the bankruptcy court as Exhibit 5.[4] Morency noted, however, that some of the Room Sheets for December were missing. Nevertheless, she was able to corroborate that the Room Sheets were from 2001 from the Guest Forms for the rooms in the Inn (Exhibit 6) on which guests frequently made comments and set forth the dates of their stay. Morency testified unequivocally that she had no knowledge of the altering of documents prior to the time she discovered the

---

[4] Neither the Creditor nor Follo compared the occupancy rate for the altered 2001 Room Sheets which were ostensibly for 2002 and the actual Room Sheets for 2002 or compared the actual occupancy rates for 2001 and 2002. In other words, neither set forth the precise number of rooms occupied at the Inn for 2001 and 2002.

problem while preparing for the trial in the adversary proceeding Follo commenced against her.

Morency further testified that Exhibit 1 (Vermont trial Exhibit 51) contained original Guest Forms, but that Exhibit 2 (Vermont Exhibit 52) contained photocopies. In addition the Room Sheets for 2001 which she discovered in the storage shed, as noted above, were photocopies. Morency indicated that she learned that Florindo had sent Guest Forms directly to Follo.

On cross-examination, Morency was questioned about her malpractice claim against the attorney who represented her during the trial in the Vermont state court. Morency commenced a malpractice action against her Vermont trial attorney, Richard Bowen, Esq., prepetition on grounds that he did not adequately assist her in trial preparation. Following the commencement of Morency's bankruptcy case, the Chapter 7 Trustee engaged special counsel; Attorney Bowen's malpractice carrier settled Morency's claim of malpractice with the Trustee for $162,500.

Morency was presented with evidence that she had had an opportunity to review Exhibit 2 (Vermont Trial Exhibit 52) during a deposition conducted on July 14, 2005 during the Vermont litigation on cross-examination. She explained that even though she could have reviewed the exhibit between July of 2005 and the state court trial in April of 2007 her trial attorney never showed her the documents comprising that exhibit or discussed them with her. During his cross-examination of Morency, counsel to Follo, recognized that Exhibit 2 had been altered.

10

Follo called Attorney Ankuda, who represented Follo in the Vermont litigation, as well as in the purchase of the Inn, as a witness in the claim objection trial. He explained his understanding that Conn Kavanaugh represented Morency after the limited remand to the trial court from the Vermont Supreme Court and was involved in a mediation in Newfane, Vermont that was unsuccessful.

Attorney Ankuda testified that he did not alter Exhibit 2. He stated:

That document was mailed to me by Mr. Florindo's attorney and it's not -- I'm not entirely clear if Ms. Benelli was serving as his attorney at the moment that she mailed that. He engaged her and disengaged her a number of times while we were arguing about discovery, but she sent that to me and I believe in February of 2005.

Attorney Ankuda further testified that it would have been his practice after obtaining the photocopied documents that became Exhibit 52, which he received on or around February 4, 2005, to have a Bates stamp applied to the pages of the exhibit and then to have a copy of the exhibit made for Follo. Attorney Ankuda used his copy with the Bates stamp affixed to each page and an additional exhibit identification of "PF 30" at depositions of Morency and Florindo which took place on February 14, 2005. He admitted that he had no recollection of asking Morency to compare Exhibits 1 and 2 (Vermont Trial Exhibits 51 and 52) during her deposition and that the first time he did so was at the trial. He also stated that he did not examine the exhibits before the trial and did not insist on receiving originals.

By agreement, the parties designated excerpts of Carl Follo's testimony during trial in the adversary proceeding and agreed to the admissibility of that testimony in the claim

objection trial.  During his testimony, Carl Follo admitted that his partner, Pam Beecher ("Beecher"), fell in love with the Inn when she first toured the property, which motivated Follo's purchase.  He further testified that when he decided to sell the Inn, its annual revenue was listed as $305,000 on a website.  He stated, however, that "[w]e never did 305."  Carl Follo admitted that he used a gross revenue multiplier of five in evaluating the purchase of the Inn from Morency and Florindo, but later, in advertising the Inn for sale for $2.1 million, employed a multiplier of seven.  Follo eventually sold the Inn in May of 2010 for $1,880,000.

In purchasing the Inn, Carl Follo disclosed that he borrowed a total of $337,000 from Beecher beginning in 2005 after his savings were exhausted.  He further disclosed that he depleted his savings, using approximately $225,000 as a deposit and $200,000 in operating the Inn.  He added that both he and Beecher each  borrowed $35,000 from family members. In addition, they obtained a second mortgage from Mascoma Bank and borrowed from Connecticut Federal Credit Union.

In purchasing the Inn, Follo did not retain financial professionals, relying instead on the "Bed and Breakfast Guide for Idiots" from which Carl Follo obtained information about the use of a gross revenue multiplier.  Carl Follo admitted that he obtained no information from Morency or Florindo directly before purchasing the Inn; rather he obtained information from their broker, Dick Palmer.

With respect to Exhibit 1 (Vermont Trial Exhibit 51), Carl Follo testified that he received the Guest Forms directly from Florindo in January of 2004.  He was unaware that

12

it contained duplicate Bates numbers (1630, 1631, 1633, 1634, 1635, 1636 and 1637), representing pages with different information on them, although he admitted putting stickers on some pages of the exhibit.  Unlike the documents he obtained directly from Florindo (Exhibit 1/Vermont Trial Exhibit 51), he obtained Exhibit 2 (Vermont Trial Exhibit 52) from Attorney Ankuda, who had obtained the documents comprising the exhibit from Attorney Benelli, Florindo's attorney.  Carl Follo testified that he had a copy of Exhibit 2 for years, that he believed that Exhibit 2 was altered to inflate the occupancy rates at the Inn (although he surmised that the real document for 2002 would show a reduced occupancy rate), and that Morency had included numerous names in the Guest Forms which were not set forth in the Room Sheets.  In other words, he contended that Morency included names in Vermont Trial Exhibit 51 that could not be confirmed in Vermont Trial Exhibit 52.  He conceded, however, that Exhibit 52 contained the altered Room Sheets for 2001 and that "of course, it's not going to match."  He added:

> But at the time I thought they were 2002. Perpetual calendar said that, Paul Florindo said that, so I believed it was 2002.  So when I thought it was 2002 and we tried to match it to the 2002 guest information, it didn't match. So I came to the conclusion that these here names must have been added to make it look like there were more people at the inn . . .  So I stand corrected from the Vermont trial. . . .

Carl Follo stated that the 2001 Room Sheets were altered to make them look like 2002 Room Sheets, because 2002 would have shown less occupancy than the 2001 Room Sheets.  He admitted that by changing the dates on Exhibit 52 it would have made it impossible to match Exhibit 51 and Exhibit 52.  In sum, both parties conceded that there were alterations

13

to Exhibit 52, and Follo conceded that the jury would have had to conclude that one or the other of the documents was altered.

When asked "[h]ow do the alterations that were made to Exhibit 52 make it look like more people stayed at the inn than they actually did?", he answered "[t]he only way you could prove that is if I had 2002.  The real -- if I had the real 2002 [Room Sheets] and compared it to this 2001, okay, I suspect that the 2002 would show less names and less people than in this document." He concluded:

> [T]he revenues that we proved in court by their bank statements, their credit card statements, their tax statements to the Vermont meal and taxes, all showed revenues less than 50 percent of what they purported them to be to me in the brochure. So I assume if the revenues were 35 to 40 percent of what they said they were, that the rooms would be considerably lower, too, and that if you added up these here, the full year here, they came to I believe only 259 days, okay, and $47,000.

He also asserted that he did not alter Vermont Trial Exhibit 52 and that any alterations were done by either Morency or Florindo.

Florindo also denied altering the Room Sheets and testified that he provided the original copies of the 2001 Room Sheets (Exhibit 5) and 2002 Room Sheets (Exhibit 2/Vermont Trial Exhibit 52) to his attorney or to Follo.  He admitted that he took the original 2002 Room Sheets and the Guest Forms (Exhibit 1/Vermont Trial Exhibit 51) from the Inn, adding that his attorney had the original Guest Forms and 2002 Room Sheets at some point in time.  He reiterated that he gave the original Guest Forms to Follo.

Following the conclusion of the trial on November 20, 2013, the parties, by agreement, submitted Carl Follo's August 17, 2011 trial testimony in Adv. P. No. 10-1333,

14

as well as two portions of his testimony during the trial in the Vermont state court.  During

the August 17, 2011 trial, Carl Follo, who was living at the Inn at the time, was cross-

examined by Morency's counsel.  Carl Follo was asked about the report on a website, Bed

and Breakfasts and Inns for Sale, in which the Inn was reported to generate gross revenues

of $305,000 and his use of a gross income multiplier of seven in sale materials.  He insisted

that the gross revenue number was a mistake and that the realtor was responsible for the

"mispublication."  In addition, Carl Follo was asked to consider that the $226,129 gross

revenue reported by Florindo and Morency was overstated by $53,871 in merchant

deposits, resulting in actual gross revenues of $172,258, which when multiplied by 7 would

produce a value for the Inn of approximately $1,205,806, $39,194 less than what was paid

for the Inn in 2003.  Nevertheless, Carl Follo testified as follows:

> When I purchased the Inn, okay, and was told that the merchants, the -- it
> was all credit cards, okay? So for me to calculate what, using my 5, okay, the
> gross revenues, okay, would be -- 99 percent of the gross revenues came from
> credit cards. So you would take the merchant statements, which is a legal
> document, and that, okay, and you would multiply that by 5 to determine
> what I would pay for an inn.
>
> So what I'm saying is if this 53 was correct, I would take 5 times that, okay,
> at the total revenues and I would pay $250,000, okay? But they told me it was
> the total revenues, which were 99 percent from the merchant statements,
> which were 226,000. So you take 5 times that and that came out to about a
> million two. So I thought it was, it was a million two. Now I'm finding out
> that the 2., that the $226,000 in gross revenues, okay, when my forensic
> accountant got it said, "The most they could have done according to the
> merchant statements for the year 2001 was $88,000, Carl." So 88,000 I took
> times my 5. That's where I came out with I would have paid, according to my
> own strategy, $649,000 for the Inn at the time.
>
> So I don't know why she's [Morency's counsel] telling me to subtract the

15

bank deposits 'cause the bank deposits not only include the merchant deposits, okay, but they also could include if they put a hundred thousand dollars in on their own, okay? 'Cause the, the bank deposits not only include merchant deposits but includes any other forms of income that come in.

Carl Follo, as noted above, admitted that Beecher fell in love with the Inn when she walked in, although he focused on the Inn's profitability and revenues, in particular the Inn's revenue of approximately $226,000, which appeared on the tax return for 2001 and in the sale brochure, as well as the occupancy rates which appeared in the sale brochure.

On cross-examination, Carl Follo was shown the sale brochure which reflected a discrepancy in room sales for 2001 (i.e., $184,480 and $200,168). He testified that the difference was attributable to so-called "contract sales" for weddings and the like and did not affect his determination to proceed with the purchase of the Inn based upon the 2001 tax return and occupancy rates. He observed that "No one lies and increases the amount of their income tax. . . ." Moreover, Follo admitted that for tax year 2005 he reported gross revenue of $219,000, although the Inn sustained considerable losses, at least in part due to a different business plan and renovations. He maintained that the gross revenue figure included sums from loans he obtained.

## III. POSITIONS OF THE PARTIES

A. <u>Conn Kavanaugh</u>

The Creditor initiates its argument by noting the following:

Key to the Vermont Supreme Court's decision upholding the jury verdict against Morency was Morency's inability at the Vermont trial to square with one another certain trial exhibits that appeared to be in her own handwriting (Exhibits 1 and 2 here) and the resulting inferences that could be drawn by

16

a jury. Specifically, as this Court [Bailey, J.] noted in its Memorandum of
Decision dated April 2, 2013 in associated Adversary Proceeding 10-01133,
In re Morency, 2013 WL 1342485, *5, n. 5 (Bankr. D. Mass. April 2, 2013) . . .
the Vermont Supreme Court in Para. 41 of its decision (970 A.2d at 1244)
determined that the discrepancy in names between Vermont Trial Exhibits
51 and Ex. 52 (Exhibits 1 and 2 here) provided "sufficient information for a
reasonable jury to conclude that defendant Morency made
misrepresentations by aiding in supplying false statements of occupancy
rates to plaintiff while he was deciding to purchase the Inn."

The Creditor maintains that it submitted evidence of the following:  1) that there were

alterations to Exhibit 2 (Vermont Trial Exhibit 52) and that Exhibit 5 is the unaltered

version of Exhibit 2; 2) that Morency did not make the alterations, which were not in her

handwriting; and 3) that the alterations were numerous, but not noticeable, because they

were principally made by changing the "date" field in the 2001 Room Sheets by one day.

The result of the alterations, according to Conn Kavanaugh was that the Room Sheets that

comprised Exhibit 2 appeared to be from 2002 when in actuality they were from 2001.

The Creditor contends that there was an absence of evidence that either Morency or

Florindo altered Exhibit 2, noting that the alterations did not have the effect of inflating the

occupancy rate but served only to undermine Morency's credibility.  It points to evidence

that Follo first identified and introduced Exhibit 2 into evidence at the Vermont trial, and

argues that "[t]hereafter, at the Vermont trial, under cross-examination, after Follo's lawyer

had twice referred to Exhibit 2 as from 2002 . . . , Morency, at the suggestion of Follo's

lawyer, wrote "2002" on Exhibit 2, at the same time protesting, 'But we don't know the

year. We don't know the year on that one.'" Because Morency could not match Exhibits 1

and 2 (Vermont Trial Exhibits 51 and 52), the jury was left to conclude that  either Exhibit

17

1 or 2 had been altered, and Morency committed fraud by listing fictitious guests on the Room Sheets.

In this regard, the Creditor highlights that Morency commenced an action against her Vermont trial attorney, Richard Bowen, Esq., on grounds that he did not adequately assist her in trial preparation. It emphasizes the Chapter 7 Trustee's decision to engage special counsel and the settlement with Attorney Bowen's malpractice carrier for $162,500.

Conn Kavanaugh argues that neither Morency nor Florindo altered, or had a motive for altering, the 2001 Room Sheets. The Creditor adds that Florindo had no motive to make Morency appear to be untruthful at trial as their legal positions were aligned.

According to the Creditor, Florindo testified that he delivered the original 2001 Room Sheets to his attorney, Attorney Benelli, and that he mailed originals of the 2002 Guest Forms (Exhibit 1, Vermont Trial Exhibit 51) to Follo prior to the commencement of litigation.[5] Attorney Benelli, in turn, delivered the 2001 Room Sheets (Exhibit 5) to Attorney Ankuda on February 4, 2005, and Attorney Ankuda delivered them to Follo. Attorney Benelli also gave copies of the 2001 Room Sheets to her client, Florindo, which copies were discovered by Morency in a storage facility after the sale of her family home where Florindo had initially stored them. According to the Creditor, "[t]he only opportunity Florindo had to alter the Room Sheets in the manner reflected by Exhibit 2 was

---

[5] Attorney Ankuda had "Bates numbers," used for document control in litigation, affixed to Exhibit 1, which exhibit includes several instances of unexplained duplication in the Bates numbering. (Exhibit 1, Bate numbers 1630, 1631, 1633, 1634, 1635, 1636, 1637).

before he delivered originals of Exhibit 5 to Attorney Benelli, and there is absolutely no evidence that he did so."

The documents comprising Exhibit 2 that were introduced during the Vermont trial were not originals. The Creditor argues "Attorney Ankuda testified that the document introduced at Florindo's deposition and marked with the exhibit sticker "PF30" was the same document as Exhibit 52 in the Vermont trial (Exhibit 2 here)." It further contends that "Follo, however, having introduced "PF30" as an exhibit at deposition, should have the original of that exhibit (i.e., the document with the original deposition exhibit sticker). Yet, the original of "PF30" was not produced at the Vermont trial or the evidentiary hearing" in the bankruptcy court. The Creditor adds that Exhibit 5 was altered to become Exhibit 2 some time after Exhibit 5 was delivered to Attorney Ankuda in February of 2005 and before Exhibit 2 (Vermont Trial Exhibit 52) was introduced into evidence in April of 2007 at the Vermont trial.

Conn Kavanaugh further argues that application of collateral estoppel under Vermont law requires findings, among others, that (i) there was a full and fair opportunity to litigate the issue in the earlier action and (ii) applying preclusion in the later action is fair. Follo v. Morency (In re Morency), Adv. P. No. 10-1133, 2013 WL 1342485, at *14 n.16 (Bankr. D. Mass. April 2, 2013), *aff'd in part and remanded,* 507 B.R. 421 (D. Mass. 2014).[6] It

---

[6] According to the bankruptcy court in Follo v. Morency,

The Vermont Supreme Court has identified six requirements for the application of collateral estoppel to a particular issue. Many of the cases that address this issue mention only five of these:

maintains that Morency was deprived of a full and fair opportunity to litigate the claims

against her in Vermont because "[s]he was confronted at trial for the first time with

evidence that undoubtedly had been altered, that evidence was used forcefully and

effectively to impeach her credibility, and that impeachment provided "sufficient

information for a reasonable jury to conclude that defendant Morency made

misrepresentations by aiding in supplying false statements of occupancy rates to plaintiff

---

> [P]reclusion should be found only when the following
> criteria are met: (1) preclusion is asserted against one who
> was a party or in privity with a party in the earlier action; (2)
> the issue was resolved by a final judgment on the merits; (3)
> the issue is the same as the one raised in the later action; (4)
> there was a full and fair opportunity to litigate the issue in
> the earlier action; and (5) applying preclusion in the later
> action is fair.

Trepanier v. Getting Organized, Inc., 155 Vt. 259, 265, 583 A.2d 583, 587
(1990). Expanding on the fourth and fifth requirements, the court stated:

> No one simple test is decisive in determining whether either
> of the final two criteria are present; courts must look to the
> circumstances of each case. Among the appropriate factors
> for courts to consider are the type of issue preclusion, the
> choice of forum, the incentive to litigate, the foreseeability of
> future litigation, the legal standards and burdens employed
> in each action, the procedural opportunities available in each
> forum, and the existence of inconsistent determinations of
> the same issue in separate prior cases. In short, in order to
> satisfy the final two criteria, the party opposing collateral
> estoppel must show the existence of circumstances that
> make it appropriate for an issue to be relitigated.

Id., 155 Vt. at 265, 583 A.2d at 587–88 (internal citations omitted).

Follo v. Morency (In re Morency), 2013 WL 1342485, at *9.

while he was deciding to purchase the Inn.'" (quoting <u>Follo v. Morency (In re Morency)</u>, 2013 WL 1342485, *5, n.5).   The Creditor relies upon <u>McLellan v. Columbus I-70 West Auto-Truckstop, Inc.</u>, 525 F. Supp. 1233, 1235 (N.D. Ill. 1981), for the proposition that newly discovered evidence that was essential to a proper decision in the prior action is relevant to the collateral estoppel analysis, adding that Morency did not discover the evidence of the altered Exhibit 2 until the eve of trial in the adversary proceeding.   The Creditor, citing <u>Gilberg v. Barbieri</u>, 53 N.Y.2d 285, 291-292, 423 N.E.2d 807, 809 (N.Y. 1981), also points to the incompetence of counsel to support its argument that Morency did not have a full and fair opportunity to litigate Follo's claims.

The Creditor concludes that application of issue preclusion would not be fair to it, would result in an injustice, and would be contrary to public policy or constitute a "special circumstance." It cites <u>National R.R. Passenger Corp. v. Pa. Public Utility Comm'n</u>, 288 F.3d 519, 528 (3d Cir. 2002), *cert. denied,* 538 U.S. 1057 (2003) ("the Court must consider whether there are special circumstances present which make it inequitable or inappropriate" to apply collateral estoppel); <u>Carolina Renewal, Inc. v. S.C. Dept. of Transp.</u>, 385 S.C. 550, 555, 684 S.E.2d 779, 782 (2009) ("[E]ven if all the elements for collateral estoppel are met, when unfairness or injustice results or public policy requires it, courts may refuse to apply it."). *See also* Restatement (Second) of Judgments, § 28(5) (listing as an exception to the application of collateral estoppel when "the party sought to be precluded, as a result of the conduct of his adversary or other special circumstances, did not have a full and fair adjudication in the initial action.").

B. <u>Follo</u>

Follo seeks allowance of his proof of claim as filed. He argues that the evidence established that Carl Follo did not alter Exhibit 2 (Vermont Trial Exhibit 52). Follo contends that the Creditor's suggestion that Carl Follo altered Exhibit 2 almost two years before the Vermont Trial in order to trip up Morency on the witness stand is preposterous. In Follo's view, even though Morency could not reconcile the names in Exhibit 1 with the names in Exhibit 2 because Exhibit 2 had been altered, the jury in the state court trial had numerous other grounds to discredit her testimony and conclude that she was part of the scheme to defraud Follo. Follo adds that her poor performance as a witness was her own fault and not due to any misconduct on Follo's part. Follo argues that the Creditor stands in Morency's shoes with respect to her defenses to liability on the Follo claim, adding "[t]here is nothing unfair about granting preclusive effect to the compensatory damages determination of the Windham Superior Court and denying Conn Kavanaugh's objection."[7]

Follo also argues that the evidence established that he believed Exhibit 2 (Vermont Trial Exhibit 52) to be genuine. Follo maintains that he thought Exhibit 2 contained the

---

[7] Follo added:

The jury in the trial before the Windham Superior Court determined that Paul Florindo and Morency had defrauded Follo by selling the Inn . . . to him on false representations of its revenues and occupancy. That fraud caused Follo to lose hundreds of thousands of dollars and a substantial part of his life savings. At present, the only meaningful remedy that Follo has for that fraud is his Claim against the Morency bankruptcy estate. Conn Kavanaugh's attempt to have the Court disallow Follo's claim is without merit and would work a substantial injustice.

2002 Room Sheets because the dates corresponded to those on the perpetual calendar and that Florindo informed him that Exhibit 2 contained the 2002 Room Sheets. Follo stated that, when Carl Follo testified during the Vermont trial, he believed that names were added to make the occupancy at the Inn appear higher than it actually was. Carl Follo admitted that he was incorrect, stating that the 2001 Room Sheets were altered to make it look like they were 2002 Room Sheets because the actual 2002 Room Sheets would have shown a reduced occupancy rate.

According to Follo, 1) Florindo's counsel during the trial in the Vermont state court, Attorney Benelli, mailed Exhibit 2 to Follo's counsel, Attorney Ankuda, in February of 2005; 2) Florindo produced Exhibit 2 to Follo's counsel through his own counsel; and 3) other than putting Bates stamp numbers on Exhibit 2, Attorney Ankuda did not change Exhibit 2, which contained photocopies. Attorney Ankuda then provided copies to Follo. In Follo's view, Morency and Florindo had the opportunity to alter Exhibit 2 by altering the 2001 Room Sheets to make them appear to be 2002 Room Sheets. Follo notes that although the 2001 Room Sheets had been left at the Inn, Morency, nonetheless, conveniently found copies of the 2001 Room Sheets just a few weeks before the trial in the adversary proceeding.

Follo emphasizes that, although he had the originals of the 2001 Guest Forms, he never had the original 2002 Guest Forms or 2002 Room Sheets, adding that Florindo could provide no explanation as to how Exhibit 2 had been altered even though the original 2001 and 2002 Room Sheets had been at one time in his possession.

23

Follo further argues:

> In the first instance, the Court lacks jurisdiction to review the compensatory damages decision of the Windham County Superior Court establishing Follo's Claim against Morency. That decision is sufficiently final under the circumstances to trigger the Rooker-Feldman doctrine pursuant to which the Court cannot act, in effect, as an appellate court to review state court decisions. Furthermore, Conn Kavanaugh has failed to establish that it would be unfair to give collateral estoppel effect in this bankruptcy proceeding to the Windham County Superior Court's compensatory damages decision.

Follo, citing <u>Exxon Mobil Corp. v. Saudi Basic Indus. Corp.</u>, 544 U.S. 280 (2005), maintains that application of the Rooker-Feldman doctrine deprives this Court of jurisdiction to determine the Creditor's objection to Follo's claim.  Follo asserts that all the requirements for application of the Rooker-Feldman doctrine are present, namely (i) the losing party in state court brings suit in federal court, (ii) after the state proceedings have ended, (iii) complaining of an injury caused by the state court judgment and (iv) seeking review and rejection of that judgment.  It contends that Conn Kavanaugh is "effectively a state court loser that has commenced an action in federal court by objection to Follo's Claim" because it stands in the shoes of Morency.  Citing <u>Brobrowsky v. "The Yonkers Courthouse</u>," 777 F.Supp.2d 692, 705, n.17 (S.D.N.Y. 2011), Follo asserts common identity is sufficient, particularly where the Creditor only asserts Morency's defenses to Follo's claim as it has no other independent claim or dispute with Follo. Follo urges this Court to reject the Creditor's invitation to review the Vermont judgment "because it asks this Court to reconsider that court's determination of the Debtor's liability to Follo and to deny that determination the preclusive effect to which it would otherwise be entitled."

Alternatively, Follo maintains that collateral estoppel precludes relitigation of the

Vermont judgment. Follo also maintains that the factors set forth in the bankruptcy court's

decision and in <u>Trepanier v. Getting Organized, Inc.</u>, 155 Vt. 259, 265, 583 A.2d 583, 587

(1990), have been satisfied. Follo states, in pertinent part, the following:

> The fourth and fifth factors are generally considered together. <u>In re P.J.</u>, 185
> Vt. 606, 609 (2009), 969 A.2d 133, 138. Conn Kavanaugh has the burden of
> proof on these latter two factors. <u>Morency</u>, 2013 WL 1342485, at *9 (citing
> <u>Trepanier</u>, 155 Vt. At 265, 583 A.2d at 587-88). In considering whether there
> was full and fair opportunity to litigate in the prior action and whether it is
> fair to apply preclusion, Vermont courts consider the circumstances of each
> case and the following non-exclusive factors: the choice of forum, the
> incentive to litigate, the foreseeability of future litigation, the legal standards
> and burdens employed in each action, the procedural opportunities available
> in each forum, and the existence of inconsistent determinations of the same
> issue in separate prior cases. <u>Trepanier</u>, 155 Vt. At 265, 583 A.2d at 587.
> Vermont courts focus on the procedural fairness of applying collateral
> estoppel to preclude subsequent litigation of an issue decided in a prior
> action, for example if the evidentiary burdens were lower in the prior action
> than in the subsequent proceeding. *See, e.g.*, <u>State v. Pollander</u>, 167 Vt. 301,
> 306 (1997), 706 A.2d 1359, 1361-62 (failure to obtain determination of DUI in
> earlier criminal proceeding did not preclude state from relitigating the issue
> in a subsequent civil proceeding); <u>Cold Springs Farm Development, Inc. v.
> Ball</u>, 163 Vt. 466, 471-72 (1995) 661 A.2d 89, 92-93 (determination of issue in
> small claims court could not be used to preclude subsequent litigation of
> issue in Superior Court).

Follo further argues that there is nothing unfair about preclusively applying the Vermont

judgment because the forum did not prejudice Morency and common law fraud was

determined with reference to the clear and convincing evidence standard. Moreover, Follo

emphasizes that there was no evidence that Carl Follo altered Exhibit 2. Citing <u>Kensington</u>

<u>Rock Island Ltd. P'ship v. Am. Eagle Historic Partners</u>, 921 F.2d 122, 125-26 (7th Cir. 1990);

and <u>Redgrave v. Musselman (In re Finley, Kumble, Wagner, Heine, Underberg, Manley,</u>

Myerson & Casey), 157 B.R. 1, 4 n.6 (S.D. N.Y. 1993), aff'd, 22 F.3d 1091 (2d Cir. 1994) ("[I]f successive claims of attorney malpractice were themselves sufficient to avoid collateral estoppel, no fact finding or judgment would be subject to collateral estoppel or res judicata."), Follo adds that "[e]ven though a litigant has been ill-served by its attorney, it may not avoid the preclusive effect of issues finally determined while represented by that attorney; instead, the litigant's recourse is a suit for malpractice against the attorney." Finally, Follo argues that the jury at the Vermont trial had ample other evidence to support its verdict against Morency that she knowingly or recklessly made false statements regarding the Inn's occupancy and revenues and for the jury to disbelieve Morency's protestation that she did not know Florindo had provided false documentation, citing Follo v. Florindo, 185 Vt. 390, 409-10, 970 A.2d 1220, 1244-45 (2009).  In sum, Follo contends that the Creditor failed to adduce any evidence of fraud on the Vermont court.

## IV. DISCUSSION

A. Legal Standard

Section 502(a) of the Bankruptcy Code provides:

[a] claim or interest, proof of which is filed under [§ ] 501 of this title, is deemed allowed, unless a party in interest, including a creditor of a general partner in a partnership that is a debtor in a case under chapter 7 of this title, objects.

11 U.S.C. § 502(a).  As the United States Bankruptcy Appellate Panel for the First Circuit observed in Hann v. Educ. Credit Mgmt Corp. (In re Hann), 476 B.R. 344 (B.A.P.1st Cir. 2012), aff'd, 711 F.3d 235 (1st Cir. 2013), observed:

> The Bankruptcy Code defines a "claim" as a "right to payment," 11 U.S.C. § 101(5)(A), "usually referring to a right to payment recognized under state law." <u>Travelers Cas. and Sur. Co. of America v. Pac. Gas and Elec. Co.</u>, 549 U.S. 443, 451, 127 S.Ct. 1199, 167 L.Ed.2d 178 (2007). The Bankruptcy Code defines the term "debt" as the "liability on a claim." 11 U.S.C. § 101(12). The reflexive definitions of "claim" and "debt" reveal "Congress' intent that the[ir] meanings . .. be coextensive." <u>Pennsylvania Dept. of Pub. Welfare v. Davenport</u>, 495 U.S. 552, 558, 110 S.Ct. 2126, 109 L.Ed.2d 588 (1990).

<u>In re Hann</u>, 476 B.R. at 354.  "A proof of claim executed and filed in accordance with [the Bankruptcy Rules] . . . constitutes prima facie evidence of the validity and amount of the claim.  Fed. R. Bankr. P. 3001(f)). Pursuant to Fed. R. Bankr.P. 3007(a), "[a]n objection to the allowance of a claim shall be in writing and filed." *See* Fed. R. Bankr. P. 3007(a).

Section 502(b) provides that if such an objection is made, "the court, after notice and a hearing, shall determine the amount of such claim in lawful currency of the United States as of the date of the filing of the petition, and shall allow such claim in such amount." 11 U.S.C. § 502(b).

Section 502(b) itemizes nine grounds upon which a claim may be disallowed. *See* 11 U.S.C. § 502(b). Although Conn Kavanaugh does not mention § 502(b)(1) in its Post-Hearing Brief, it is the only relevant subsection upon which it can rely as it provides for the disallowance of a claim that is "unenforceable against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured."  *See* 11 U.S.C. § 502(b)(1).

In <u>Hann</u>, the panel, citing, *inter alia*, <u>Katchen v. Landy</u>, 382 U.S. 323, 329, 86 S.Ct. 467, 15 L.Ed.2d 391 (1966), and <u>In re Dow Corning Corp.</u>, 215 B.R. 346, 354 (Bankr. E.D. Mich.

1997), noted that "the Supreme Court has long recognized that the process of claims allowance includes dual determinations of both validity and the amount of the claim." Hann, 476 B.R. at 355. *See also* In re Leroux, 216 B.R. 459, 468 (Bankr. D. Mass. 1997). "Disallowance of a claim negates its validity and existence[.] A claim should be rejected and disallowed [ ] when it has no basis in fact or law, is non-existent or illegal." Diasonics, Inc. v. Ingalls, 121 B.R. 626, 630 (Bankr. N.D. Fla. 1990) (citation omitted).

B. Analysis

This Court agrees with and adopts Judge Bailey's May 16, 2013 rulings regarding the Creditor's standing and application of the Rooker-Feldman doctrine. Accordingly, this Court shall focus on application of collateral estoppel in the context of the Creditor's "fraud on the court argument."

The Creditor's position is predicated upon disallowance of Follo's claim on the ground that a falsified document was admitted into evidence in the Vermont litigation, thereby constituting "fraud on the court." Both the Creditor and Follo, while referencing collateral estoppel, assume that the Creditor and Morency are in privity and that the Creditor stands in the shoes of the Debtor. Notably, a party relying on collateral estoppel must establish the following: "(1) preclusion . . . [can only be] . . . asserted against one who was a party or in privity with a party in the earlier action; (2) the issue was resolved by a final judgment on the merits; (3) the issue is the same as the one raised in the later action; (4) there was a full and fair opportunity to litigate the issue in the earlier action; and (5) applying preclusion in the later action is fair." *See* Trepanier v. Getting Organized, Inc., 155

28

Vt. at 265.  In <u>Garceau Auto Sales, Inc. v. Carpenter (In re Carpenter)</u>, No. 13-10080, Adv.

P. No. 13-1011, 2014 WL 3848578 (Bankr. D. Vt. Aug. 1, 2014), the bankruptcy court stated:

> When describing privity in the context of collateral estoppel, the New York
> courts have emphasized that it is "amorphous" and not easy to define. For
> example, one well known decision on the topic includes the following
> general description:
>
>> ... the term privity does not have a technical and well-defined
>> meaning. Rather, it is an amorphous concept not easy of
>> application, and includes those who are successors to a
>> property interest, those who control an action although not
>> formal parties to it, those whose interests are represented by a
>> party to the action, and possibly coparties to a prior action.
>> Importantly, all the circumstances must be considered from
>> which one may infer whether or not there was participation
>> amounting to a sharing in control of the litigation.

<u>In re Carpenter</u>, 2014 WL 3848578, at *5 (citing <u>Juan C. v. Cortines</u>, 89 N.Y.2d 659, 667–668,

657 N.Y.S.2d 581, 679 N.E.2d 1061 (N.Y. 1997) (internal citations and quotations omitted).

The Vermont bankruptcy court further observed:

> New York's highest court subsequently made clear that since issue
> preclusion has such a dramatic impact on a party's rights, all doubts with
> respect to the privity inquiry should be resolved against imposing
> preclusion:
>
>> [i]n addressing privity, courts must carefully analyze whether
>> the party sought to be bound and the party against whom the
>> litigated issue was decided have a relationship that would
>> justify preclusion, and whether preclusion, with its severe
>> consequences, would be fair under the particular
>> circumstances. *Doubts should be resolved against imposing*
>> *preclusion* to ensure that the party to be bound can be
>> considered to have had a full and fair opportunity to litigate.

<u>Id.</u> at *5 (citing <u>Buechel v. Bain</u>, 97 N.Y.2d 295, 304–305, 766 N.E.2d 914 (N.Y. 2001)

(emphasis in original)).

Based upon the foregoing, the Court rules that collateral estoppel is inapplicable for several reasons. First, there is an absence of privity between the parties in the underlying Vermont litigation and the claim objection. As this is not a surplus case, Morency would have no standing to object to Follo's claim. *See* <u>In re Choquette</u>, 290 B.R. 183 (Bankr. D. Mass. 2003). The Creditor, as Judge Bailey recognized does have standing to object to Follo's claim. Moreover, the Creditor is not a successor in interest to Morency and shares no liability on Follo's claim against her. Conn Kavanaugh established no relationship, legal or otherwise, with Morency, until well after entry of the judgment in the Windham Superior Court. As her creditor, it is not in privity with her.

Moreover, there is an absence of identity of issues between the state court action and the Creditor's Objection to Follo's proof of claim. The issues in the Vermont litigation were whether Morency was liable to Follo for common law fraud and for violation of Vermont's consumer fraud statute. The issue in this litigation is whether Follo committed fraud on the Vermont state court by altering Exhibit 2 (Vermont Trial Exhibit 52), thereby warranting disallowance of the proof of claim filed in the case. Accordingly, another of the elements required for application of collateral estoppel is absent, thereby obviating consideration of fairness.

Similarly and consistent with Judge Bailey's ruling, the Court concludes that the Rooker-Feldman doctrine is not implicated because the Creditor is not seeking review of the state court judgment; rather it is seeking a determination that Follo's proof of claim

must be disallowed because it was procured by fraud on the state court through Carl

Follo's alteration of Exhibit 2 (Vermont Trial Exhibit 52).  In TBF Fin., LLC v. Gregoire, 118

A.3d 511, 2015 WL 1186299 (Vt. 2015), the court set forth the law applicable to fraud

perpetrated on a court, stating:

> Although the general rule bars relief from judgment on account of fraud
> more than a year after a final judgment, defendants invoke a narrow
> exception for when the fraud in question is fraud upon the court. Rule 60(b)
> itself recognizes that there is no limit to "the power of a court to . . . set aside
> a judgment for fraud upon the court." V.R.C.P. 60(b). Fraud upon the court
> is a narrow doctrine, encompassing only that fraud which "does or attempts
> to[ ] defile the court itself, or is a fraud perpetrated by officers of the court so
> that the judicial machinery cannot perform in the usual manner its impartial
> task of adjudging cases." Godin, 168 Vt. at 519, 725 A.2d at 908 (quotation
> omitted). It is reserved for "the most egregious misconduct directed to the
> court itself" and "must be supported by clear, unequivocal and convincing
> evidence." Id. (quotation omitted).

TBF Fin., LLC., 118 A.3d at 519, 2015 WL 1186299, at *6.  This Court concludes that the

Creditor has failed to establish that Carl Follo altered Exhibit 2 (Vermont Trial Exhibit 52).

Although it is uncontested that Vermont Trial Exhibit 52 was altered, the evidence was

inconclusive that Carl Follo tampered with that exhibit.  See deBenedictis v. Brady-Zell (In

re Brady-Zell), 756 F.3d 69, 72-73 (1st Cir. 2014).  Follo and Florindo accused each other of

altering the document, and Morency testified that she did not alter the document.

In the Memorandum issued in the adversary proceeding, which is incorporated by

reference in this Memorandum, see Follo v. Morency (In re Morency), Adv. P. No. 10-1133,

(Bankr. D. Mass. Sept. 18, 2015), this Court evaluated application of collateral estoppel to

Follo's assertion of an exception to discharge predicated upon submission of a false

financial statement within the meaning of 11 U.S.C. § 523(a)(2)(B). Specifically, the Court evaluated whether the Debtor had a full and fair opportunity to litigate in the state court those elements that would, in combination, make up a cause of action under § 523(a)(2)(B) and whether a decision to except Follo's debt from discharge based upon the decision of the District Court to take judicial notice of matters outside the record would be fair and appropriate. This Court's decision in the adversary proceeding rested, not only on application of collateral estoppel, but on its conclusions that Follo should not be permitted to assert a claim under § 523(a)(2)(B) because Follo failed to cogently set forth such a claim in the Complaint and in the Joint Pretrial Memorandum and that Follo should be procedurally defaulted for failing to submit relevant evidence in the form of state court trial transcripts and jury instructions at the trial which the bankruptcy court conducted on August 17, 2011. This Court did not, and finds it inappropriate to, evaluate whether Follo has a claim for common law fraud and the amount of that claim based solely on the alteration of an exhibit in the state court. Follo has a claim against the Debtor; it simply is not excepted from discharge.

Having failed to establish all the elements required for application of collateral estoppel, including an identity of issues, and having failed to prove that Follo altered Vermont Trial Exhibit 52, this Court concludes that the Creditor failed to satisfy its burden of proof with respect to its Objection to Follo's proof of claim.

## IV. CONCLUSION

In view of the foregoing, the Court shall enter an order overruling the Creditor's

Objection to Follo's claim.

By the Court,

Joan N. Feeney
United States Bankruptcy Judge

September 18, 2015